## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

MICHELLE MOODY                                    :

                                                  :        No. 14-cv-4912

    VS.

                                                  :

ATLANTIC CITY BOARD OF EDUCATION

## **BRIEF IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

Respectfully Submitted by:


Samuel A Dion, Esquire
Dion & Goldberger
1845 Walnut Street
Suite 1199
Philadelphia, PA 19103
215-546-6033
samueldion@aol.com
*Counsel for Plaintiff*

TABLE OF CONTENTS

Table of Authorities                                          iii

I.    Preliminary Statement                                   1

II.   Relevant Facts                                          3

III.  Argument                                                4

      A.   Marshall's Conduct Resulted in a
           Tangible Employment Action                         4

      B.   Moody Can Establish a Prima Facie
           Case of Sexually Hostile Work Environment          11

           1.   *Moody Was Discriminated Against
                Based Upon Her Sex*                           12

           2.   *The Discrimination was Pervasive
                and Regular*                                  12

           3.   *Moody Was Detrimentally affected by
                the Discrimination*                           14

           4.   *The Discrimination to Which Moody
                Was Subjected Would Detrimentally
                Affect Any Reasonable Person
                of the Same Sex in That Position*             16

           5.   *Respondeat Superior Liability
                Exists in this Case*                          17

      C.   Moody Can Establish a Prima Facie
           Case of *Quid Pro Quo* Sexual Harassment           21

      D.   Moody Can Establish a *Prima Facie*
           Case Retaliation                                   25

IV.   Conclusion                                              31

TABLE OF CONTENTS (CONT'D)

Response to Defendant's Statement
of Undisputed Facts                              Attached

Plaintiff's Supplemental Statement
Of Disputed Material Facts                       Attached

Proposed Order                                   Attached

Appendix  (1-238)                                Attached

TABLE OF AUTHORITIES

| Citations | Pages |
|---|---|

Andrews v. Philadelphia,
895 F.2d 1469 (3d Cir.1990)                    11

Blunt v. Lower Merion Sch. Dist.,
767 F.3d 247 (3rd Cir. 2014)                   3

Bonenberger v. Plymouth Tp.,
132 F.3d 20 (3rd Cir. 1997)                    21, 23

Bouman v. Block,
940 F.2d 1211(9th Cir.), cert. denied,
502 U.S. 1005, 112 S.Ct. 640,
116 L.Ed.2d 658 (1991)                         27

Bridgeport Firemen's Sick & Death
Ben. Ass'n v. Deseret Fed. Sav. & Loan Ass'n,
735 F.2d 383 (10th Cir. 1984)                  20

Burlington Industries, Inc. v. Ellerth,
524 U.S. 742 (1998)                            10-11

Burlington Northern and Santa Fe
Ry. Co. v. White, 548 U.S. 53, 126 S.Ct. 2405,
165 L.Ed.2d 345 (2006)                         26

Cloverland-Green Spring Dairies, Inc.
v. Pa. Milk Mktg. Bd.,
298 F.3d 201 (3d Cir. 2002)                    3-4

Cohen v. Fred Meyer, Inc.,
686 F.2d 793 (9th Cir. 1982)                   27

Fakete v. Aetna, Inc.,
308 F.3d 335 (3d Cir. 2002)                    3-4

| Citations (Cont'd) | Pages |
|---|---|
| Faragher v. City of Boca Raton, 524 U.S. 775 (1998) | 10-11, 18 |
| Hams v. Forklift Systems, Inc., 510 U.S. 17, 22 (1993) | 2, 19 |
| Hargrave v. County of Atlantic, 262 F.Supp.2d 393 (D.N.J. 2003) | 11, 25 |
| Harris v. Forklift Sys., Inc., 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) | 4-5, 16-17 |
| Hurley v. Atlantic City Police Dept., 174 F.3d 95 (3rd Cir. 1999) | 23-14 |
| Jin v. Metropolitan Life Ins. Co., 295 F.3d 335 (2nd Cir. 2002) | 10-11 |
| Kramer v. Wasatch County Sheriff's Office, 743 F.3d 726 (10th Cir. 2014) | 20 |
| Lehmann v. Toys R Us, Inc., 626 A.2d 445 (N.J. 1993) | 24 |
| Lutkewitte v. Gonzales, 436 F.3d 248 (D.C. Cir. 2006) | 19 |
| Meritor Savings Bank v. Vinson, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) | 4-5, 9-10 |
| Miller v. D.F. Zee's, Inc., 31 F.Supp.2d 792 (D.Or. 1998) | 27 |
| Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575 (3d Cir. 2003) | 3-4 |

Citations (Cont'd)                                          Pages


Newton v. Cadwell Labs.,
156 F.3d 880 (8th Cir.1998)                                 24


Pa. State Police v. Suders,
542 U.S. 129 (2004)                                         18


Pagan v. Holder,
741 F.Supp.2d 687 (D.N.J. 2010)                            25


Pennsylvania Coal Ass'n v. Babbitt,
63 F.3d 231 (3d Cir. 1995)                                 3


Ponticelli v. Zurich American Ins. Group,
16 F.Supp.2d 414 (S.D.N.Y.1998)                            24


Robinson v. City of Pittsburgh,
120 F.3d 1286 (3d Cir.1997)                                21-22


Spain v. Gallegos,
26 F.3d 439 (3rd Cir. 1994)                                4, 11, 17


Wilkerson v. New Media Tech. Charter
School, Inc., 522 F.3d 315 (3d Cir.2008)                   25


Statutes                                                    Pages


29 C.F.R. § 1604.11                                        10, 22

42 U.S.C. Sec. 2000e                                       4, 18
NJLAD                                                       11, 25

Restatement (Third) of Agency
§ 3.03, cmt. c (2006)                                      20

Title VII                                                  4, 10-11, 13
                                                           16-18, 25, 27

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

---

MICHELLE MOODY       :

           :  No. 14-cv-4912

 VS.

           :

ATLANTIC CITY BOARD OF EDUCATION

---

**BRIEF IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

I. Preliminary Statement

  Defendant Atlantic City Board of Education's Motion for Summary Judgment is not well received.  Moody testified that on about October 26, 2012, Mr. Marshall told her "You can receive more hours if you exchange sexual favors with me." (App. 97). That set the tone for her employment under Mr. Marshall. The evidence of sexual harassment is overwhelming in this case in that and is supported by text messages sent by the harasser, Maurice Marshall (a custodial foreman employed by defendant) to plaintiff, Michelle Moody (hereinafter "Moody").  Mr. Marshall's text messages to Moody on December 27, 2012 validate her claims of a sexually hostile work environment.  Mr. Marshall texted: "Ok ill hit u when I go to work … tonight [at] my other job I am getting all three holes" (App. 3 and 33). After Moody's rejected this sexual advance in a return text, Mr. Marshall then texted "How's penn treating u… U got steady work and that's where the

1

contracts going to b at… I got u" (App. 3, 34, 100 and 189). This text message is direct evidence of Moody's claim that her assigned work hours, and her possible promotion to a full-time contract position, were conditioned upon giving Mr. Marshall sexual favors.  Mr. Marshall bragged "I got u", meaning he had Moody up against a wall. (App. 3 and 34).

The thing that makes this case especially egregious is that Mr. Marshall was responsible for scheduling substitute custodians such as Moody to work at his school and he had free reign and full autonomy to schedule whomever he wanted to work or not work as a substitute custodian on any given day at his school.  (App. 92, 107, 118 and 187). (App. 92, 107, 118 and 187).  Given these powers to increase or decrease Moody's hours in a significant manner, which bestowed upon him by defendant, defendant is vicariously liable for his the sexually hostile work environment to which he subjected Moody in this case. (See Section B(5) below).

Moody was subjected to two months of the most pernicious and oppressive forms of sexual harassment that can occur in the workplace. Hams v. Forklift Systems, Inc., 510 U.S. 17, 22 (1993). Ultimately, Mr. Marshall was able to convince Moody to have unwanted sexual relations with him because Moody feared he would cut her hours if she did not.  After Moody complained to

upper management about Mr. Marshall's conduct, defendant took no action to safeguard her earnings, and Moody never regained the substantial hours she was given by her harasser, Mr. Marshall. So instead of being helped in her time of need by defendant, Moody was left alone to fail.

## II. Relevant Facts

The relevant facts in this matter are set forth in detail on "Plaintiff's Supplemental Statement of Disputed Material Facts" which are attached and part of this Brief.  These facts are fully supported by sworn deposition testimony of the parties and witnesses and other supporting documents contained in the Appendix submitted with this Brief.  (App. 1-238).

When considering a motion for summary judgment, this Honorable Court must view the underlying facts, and make all reasonable inferences therefrom, in the light most favorable to Moody. Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995); and Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 265 (3rd Cir. 2014). "A factual dispute is material if it bears on an essential element of the plaintiff's claim, and is genuine if a reasonable jury could find in favor of the nonmoving party." Blunt at 265 (citing Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 580 (3d Cir. 2003) (in turn citing Fakete v. Aetna, Inc., 308 F.3d 335, 337 (3d Cir. 2002) (in turn

quoting Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd., 298 F.3d 201, 210 (3d Cir. 2002))).

The facts set forth in "Plaintiff's Supplemental Statement of Disputed Material Facts" support the factual allegations set forth in Moody's Complaint.


III.  Argument

A.  Marshall's Conduct Resulted in a Tangible Employment Action

The Third Circuit set forth the standard for hostile work environment sexual harassment claims in its opinion in Spain v. Gallegos, 26 F.3d 439 (3rd Cir. 1994).  Starting on page 446 of its opinion, the Third Circuit in Spain cited the ruling of the Supreme Court in Harris v. Forklift Sys., Inc., 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) as the source of its standard.

The Third Circuit noted that Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer to discriminate against any individual on the basis of sex with respect to his/her compensation, terms, conditions or privileges of employment." (42 U.S.C. Sec. 2000e-2(a)(1)). The Circuit Court noted that the Supreme Court in Harris determined that with respect to a sexually hostile work environment claim:

> As we made clear in Meritor Savings Bank v. Vinson, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), **this language 'is not limited to "economic" or "tangible" discrimination. The phrase "terms, conditions, or**

4

> **privileges of employment" evinces a congressional intent
> "to strike at the entire spectrum of disparate treatment of
> men and women" in employment,' which includes requiring
> people to work in a discriminatorily hostile or abusive
> environment.**

Harris at 446.  The U.S. Supreme Court decision in <u>Meritor</u>

involved facts very similar to the matter at bar.  In that case,

a female subordinate Vinson alleged that her manager Taylor

started harassing her by:

> … invit[ing] her out to dinner and, during the course of
> the meal, suggested that they go to a motel to have sexual
> relations. At first she refused, but out of what she
> described as fear of losing her job she eventually agreed.
> According to respondent, Taylor thereafter made repeated
> demands upon her for sexual favors, usually at the branch,
> both during and after business hours; she estimated that
> over the next several years she had intercourse with him
> some 40 or 50 times.

(Meritor at 5-6).  From these facts, the U.S. Supreme Court

determined that Vinson's experiences at the workplace

constituted a sexually hostile work environment given that the

sexual relations between her and her supervisor were unwelcomed.

Moody likewise is able to set forth a claim of hostile work

environment sexual harassment based upon the unwanted sexual

advances made by her foreman, Mr. Marshall.

Shortly after Mr. Marshall started assigning work to Moody

at the New York Avenue School on about October 26, 2012, Mr.

Marshall told Moody: "You can receive more hours if you exchange

sexual favors with me." (App. 97).  Shortly after October 26,

2012, Mr. Marshall grabbed Moody by the arm in the stairwell and tried to pull her close to him to kiss her, but Moody pulled away. (App. 97).   Mr. Marshall made sexual comments on a daily basis thereafter.  (App. 116-117).   For example, Mr. Marshall would comment on how tight Moody's jeans were and that girls from Moody's section of town are "dirty girls."  (App. 117). Mr. Marshall also said: "If your dad knew you were dressed like that he would be shakin his head" and "Why does your butt shake like that?" and he would tell other female employees: "Don't you wish your butt was big like that." (App. 8).  Also, on a weekly basis, Mr. Marshall would often reach out and grab Moody's breasts or buttocks at the work place. (App. 8).

On about November 5, 2012, Mr. Marshall called Moody into his office and tried to take her shirt off. (App. 8). In about Mid-November 2012, Moody was called over the radio to come to Mr. Marshall's office, and when she opened the door, Mr. Marshall was sitting unclothed on his office chair. (App. 98-99).  Just before Christmas break in late December 2012, Mr. Marshall again physically grabbed Moody in the office from behind and pulled her backwards towards himself. (App. 100-101). When Moody pulled away and asked why he was doing this, Mr. Marshall responded: "You want more hours?" (App. 101).

Moody testified that all of these sexual advances were unwanted.  (App. 97-99, 101).  Moody said nothing at the time,

6

because she wanted to continue to work and was afraid Mr.
Marshall would reduce her hours and retaliate against her
family. (App. 99)

Then on December 27, 2012, Mr. Marshall boldly texted Moody
in the early evening that he expected to have sex with her and
get "...all three holes", meaning he expected to engage in " ...
sexual activities involving the anus, vagina and mouth" with
Moody that night. (App. 3, 33 and 99-100). Moody rejected this
sexual advance by text message to Mr. Marshall. (App. 3, 33 and
99). Mr. Marshall bolstered his sexual advance by stating
"How's penn treating u... U got steady work and that's where the
contracts going to b at... I got u", meaning he could help Moody
get a full-time contract at the Pennsylvania Avenue School in
exchange for her giving him sexual favors. (App. 3, 34, 100 and
189). In fact Mr. Marshall told this to Ms. Moody verbally prior
to sending the text messages. (App. 100). Mr. Marshall bragged
"I got u", meaning he had Moody up against a wall. (App. 3 and
34).

Later in the evening of December 27, 2012, Mr. Marshall
showed up at Moody's house uninvited, and when she opened the
door, he walked right in and approached Moody and told her "This
is the only way you are going to get a contract—if you have sex
with me." (App. 3 and 101-102). Moody felt frightened and
pressured by Mr. Marshall's actions. (App. 101). Mr. Marshall

7

grabbed Moody by the arms and began kissing her, despite that Moody did not want him to do so. (App. 102). Moody was "petrified" and felt her job and the security of her children had been threatened and she gave into Mr. Marshall's unwelcomed advances because she "…felt as though this was the only way that [she] was getting work hours." (App. 102). Mr. Marshall proceeded to engage in sex with Moody at that time. (App. 4 and 102).

A few days after this unwanted sexual encounter, Moody told Mr. Marshall it will never happen again. (App. 4 and 117). After Moody returned to work in early January 2013, and noticed a decline in the her hours she was being assigned by Mr. Marshall as compared to the previous month. (App. 4, 103 and 117). Between January 5, 2013 and February 4, 2013 (App. 4.6 straight weeks), Moody worked an average of 15.32 hours per week, which was a marked decrease from the 27-hour per week average during her previous weeks under Mr. Marshall's supervision. (App. 8-9 and 50-57).

On January 23, 2013, Moody went into the New York Avenue School to pick up her paycheck and found Mr. Marshall playing Ping-Pong, but Mr. Marshall delayed giving it to her at that time. (App. 4, 194 and 219). Moody also noticed that a new substitute custodian, Michelle McArthur, was working at the New York Avenue School that day. (App. 4).

8

After Moody left the New York Avenue School on January 23, 2013, she texted to Mr. Marshall to confront him about the way she was being treated and her belief that her hours were being reduced. (App. 4-5 and 15-16). Mr. Marshall admitted Moody was on his "shit list" but alleged that it would not affect her work assignments. (App. 5 and 16). However, the remainder of that week, Moody was not assigned any work by Mr. Marshall but the new substitute custodian, Ms. McArthur, was assigned three days that week. (App. 5, 53 and 56). In fact, between January 23, 2013 and January 31, 2013— a period of 9 consecutive days, Mr. Marshall did not schedule Moody. (App. 9, 53 and 56). Between September 27, 2012 and January 23, 2013, the largest gap Moody previously experienced between assignments from Mr. Marshall was 4 days. (App. 9 and 28-53).

On January 29, 2013, Moody confronted Mr. Marshall that she believed her hours were still being cut. (App. 5 and 17). Mr. Marshall was furious and texted back: "…I see you're a trouble starter don't know wts your problem but I got rid of all my trouble at this school …." (App. 6 and 17). Mr. Marshall then admitted: "Look I haven't called u in one week that's it." (App. 7 and 23).

Based upon the U.S. Supreme Court ruling in Meritor, "[t]he correct inquiry is whether [Moody] by her conduct indicated that

the alleged sexual advances were unwelcome, not whether her participation in them was voluntary. (Meritor at 9).  Even if "...sex-related conduct was "voluntary," in the sense that the complainant was not forced to participate against her will, [such] is not a defense to a sexual harassment suit brought under Title VII. The gravamen of any sexual harassment claim is that the alleged sexual advances were "unwelcome." 29 CFR § 1604.11(a) (1985)." (Id).

So in 1986, the U.S. Supreme Court in Meritor already set the stage for its 1993 decision in Hams v. Forklift Systems, Inc., 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The U.S. Supreme Court set forth the standard for unwanted sex acts as follows: "Requiring an employee to engage in unwanted sex acts is one of the most pernicious and oppressive forms of sexual harassment that can occur in the workplace. The Supreme Court has labeled such conduct "appalling" and "especially egregious." Hams at 22. The Second Circuit in Jin v. Metropolitan Life Ins. Co., 295 F.3d 335 (2nd Cir. 2002) commented with respect to the Hams ruling that "It is hardly surprising that this type of conduct—a classic quid pro quo for which courts have traditionally held employers liable-fits squarely within the definition of "tangible employment action" that the Supreme Court announced in Faragher [v. City of Boca Raton, 524 U.S. 775 (1998)] and [Burlington Industries, Inc. v.]

10

Ellerth[, 524 U.S. 742 (1998)."   (Jin at 344-345).   This Supreme
Court decision is important to the matter at bar, because it is
clear that the conduct inflicted upon Moody amounted to a
tangible employment action.

    B.   Moody Can Establish a Prima Facie Case of Sexually
        Hostile Work Environment

To establish a *prima facie* case predicated upon a sexually
hostile work environment, Moody must show that: (1) she suffered
intentional discrimination because of her female gender; (2) the
discrimination was pervasive and regular; (3) the discrimination
detrimentally affected her; (4) the discrimination would
detrimentally affect a reasonable person of the same sex in that
position; and (5) the existence of *respondeat superior*
liability.   (See Spain at 447 (citing Andrews v. Philadelphia,
895 F.2d 1469 (3d Cir.1990)(citations omitted)).

Moody has made claims for sexual harassment under both
Title VII and the NJLAD.   "As a general matter, the same
basic principles apply when evaluating … claims under these two
statutes."   Hargrave v. County of Atlantic, 262 F.Supp.2d 393,
410 (D.N.J. 2003).

### 1.   *Moody Was Discriminated Against Based Upon Her Sex*

"Without question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor "discriminate[s]" on the basis of sex."  (Meritor at 7). Mr. Marshall, who was Moody's foreman, commenced his sexual advances upon Moody on or about October 27, 2012, and Moody attested in detail to his relentless pursuit of sexual favors in exchange for hours, which thereafter culminated in his unwelcomed visit to her home on December 26, 2012 during which she engaged in unwanted sexual relations with Mr. Marshall.  Clearly, Mr. Marshall discriminated against Moody based upon her female gender in that he made continual sexual advances towards her between October 26, 2012 and December 27, 2012.

### 2.   *The Discrimination was Pervasive and Regular*

In the stretch of only about 9-1/2 weeks between October 26, 2012 and December 27, 2012, Mr. Marshall made constant sexual advances towards Moody.  As set forth in detail in Section A above, Mr. Marshall made daily sexual comments and often touched Moody on her buttocks and breast, tried to kiss her, pulled her close to him from behind, promised hours and a potential contract in exchange for sexual favors, and exposed himself to Moody in his office.  Finally, Mr. Marshall convinced Moody to engage in unwanted sexual relations with him despite all of her prior protests by using the final threat: "This is

12

the only way you are going to get a contract—if you have sex with me." (App. 3 and 101-102).

The U.S. Supreme Court has determined that employees who are required to engage in unwanted sex acts are subjected to tangible employment actions (Hams at 22). Hence, there is little doubt that Mr. Marshall's actions were pervasive. As set forth in Section A above, the U.S. Supreme Court ruled that economic damages are not a prerequisite to a Title VII hostile work environment sexual harassment claim, and that the protections under Title VII extend beyond the economic aspects of employment. (Meritor at 8-9). Granted, "[f]or sexual harassment to be actionable, it must be sufficiently severe or pervasive "to alter the conditions of [the victim's] employment and create an abusive working environment." (Id at 9). In the Meritor case, the U.S. Supreme Court ruled that [Vinson]'s allegations, which are similar to Moody's in that she was claiming she had unwanted sexual relations with her supervisor, constituted "…pervasive harassment …[which is] … plainly sufficient to state a claim for 'hostile environment' sexual harassment." (Id).

The work environment described by Moody in Section A above is clearly abusive. No female employee should ever have to work under conditions wherein a male supervisor conditions her livelihood upon giving sexual favors.

13

3.   *Moody Was Detrimentally affected by the*
     *Discrimination*

Moody worked under Mr. Marshall in constant fear.  Mr.
Marshall set the context of the relationship on October 26, 2012
when he stated: "You can receive more hours if you exchange
sexual favors with me." (App. 97).  The worst part of this is
that Mr. Marshall had absolute power to assign Moody's hours at
the New York Avenue School.  (App. 92, 107, 118 and 187). Moody
had to go to Marshall to solicit work from him to get hours at
his school. (App. 2, 93-9 and 187).  Mr. Marshall, as custodial
foreman at the New York Avenue School was responsible for
assigning work hours to substitute custodians when needed. (App.
92, 107, 118 and 187). There was usually work available for
substitute custodians during most weeks at the New York Avenue
School at that time.  (App. 188).  In fact, at the New York
Avenue School between September 27, 2012 and March 8, 2013,
substitute custodians were assigned for all but one (1) working
day not including a few days between October 29 and November 2,
2012 (during Hurricane Sandy and its aftermath) when the New
York Avenue School was likely closed.  (App. 28-63).  There is
no rotation or order to assigning jobs to substitute custodians
and the foremen have free reign and full autonomy to "pull who
they want" to work on any given workday as a substitute
custodian.  (App. 92, 107, 118 and 187).

14

Knowing that Mr. Marshall had such immense power, Moody had to take his October 26, 2012 statement about trading sexual favors for hours very seriously.  That statement set the tone for what was to follow.  After October 26, 2012, Mr. Marshall, keeping true to his promise, made daily sexual advances towards Moody including sexual remarks about her buttocks, touching her breasts and buttocks, trying to embrace her and kiss her, trying to remove her shirt, exposing himself to her in his office, and ultimately coercing her to have sexual relations with him. During all of this, Mr. Marshall constantly reminded Moody that he would give her more hours or recommend a contract[1] in exchange for sexual favors. (App. 100-102).

The terms and conditions of Moody's employment were completely altered.  Now, her work assignments (which were then primarily at the New York Avenue School) were not conditioned on her professional contacts with her foreman or even her

---

[1]  Moody believed that custodial foreman recommended which substitute custodians would be promoted to full time/contract custodians by interviewing selected candidates at meetings with all of the foremen. (App. 113).  She had good reason to believe this because Jahmil Shakur, a male substitute custodian, was called in for an interview at the Administration Building to be a full time custodian at the Pennsylvania School in about April 2012 or April 2013 and was given the job after interviewing with a group of people including several custodian foremen.  (App. 204).  Romonda Coley, a female substitute custodian, was interviewed three times by the custodial foremen before being hired as a full-time custodian. (App. 175-177).

performance, but rather upon the expectation that she would provide sexual favors to Mr. Marshall.

    4.   *The Discrimination to Which Moody Was Subjected Would Detrimentally Affect Any Reasonable Person of the Same Sex in That Position*

It is unnecessary to go into an extended analysis regarding whether or not Moody's experiences under Mr. Marshall's supervision would have caused the same detrimental effect upon any reasonable female substitute custodian.  The reader need only go over the facts and arguments set forth in Section B(3) above, to reach the conclusion that any female substitute custodian would have been detrimentally affected by Mr. Marshall's conduct.  The U.S. Supreme Court made it clear that "[r]equiring an employee to engage in unwanted sex acts is one of the most pernicious and oppressive forms of sexual harassment that can occur in the workplace. The Supreme Court has labeled such conduct "appalling" and "especially egregious." Hams at 22.

The Supreme Court explained in Harris that "[c]onduct that is not severe or pervasive enough to create an **objectively** hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive--is beyond Title VII's purview." Harris at 370-371.  So, the analysis is that the conduct must create an objectively hostile and abusive

16

environment and not something that only Moody herself would find to be hostile or abusive based upon her own disposition.   "In *Harris*, the Court held that under Title VII conduct can be actionable as harassment creating a sexually hostile work environment, eventhough it does not affect seriously an employee's well-being or lead the employee to suffer injury." (*Spain* at 449-450; and Id).   There is nothing to Moody's claim that sets her apart from any other ordinary reasonable woman. The detrimental effect of Mr. Marshall's conduct upon her is universally understood as hostile and abusive.

### 5. *Respondeat Superior Liability Exists in this Case*

It should be noted that defendant does not contend in its motion that Mr. Marshall is not a supervisor.   It is admitted that he was made a custodial foreman at the New York Avenue School starting in March 2011, and as custodial foreman, he supervised the custodians and substitute custodians at his school.   (App. 85 and 158-159).   Most importantly, he was responsible for scheduling substitute custodians to work at his school, which gave him *carte blanche* to increase or decrease the wages earned by substitute custodians employed by the defendant. (App. 92, 107, 118 and 187).

The U.S. Supreme Court ruled in *Meritor* that agency principles must be considered in a hostile work environment

sexual harassment case to determine the employer's liability for a supervisor's conduct. (Id at 11).  "Congress' decision to define "employer" to include any "agent" of an employer, 42 U.S.C. § 2000e(b), surely evinces an intent to place some limits on the acts of employees for which employers under Title VII are to be held responsible."  (Id).

In Pa. State Police v. Suders, 542 U.S. 129, 143 (2004) (quoting Ellerth at 765, and citing Faragher at 807-08), the U.S. Supreme Court set forth that:

> …A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or **a decision causing a significant change in benefits.**
>
> …When a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation. A tangible employment action in most cases inflicts direct economic harm. As a general proposition, only a supervisor, or other person acting with the authority of the company, can cause this sort of injury.
>
> …An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages.... The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.... **No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.**

Ellerth at 760-762 and 764-65; and Lutkewitte v. Gonzales, 436 F.3d 248, 251 (D.C. Cir. 2006).

As stated in Section A above, Mr. Marshall's harassment did in fact culminate in a tangible employment action in that Mr. Marshall required Moody to engage in unwanted sex acts, and such conduct is one of the most pernicious and oppressive forms of sexual harassment that can occur in the workplace.  Hams at 22.

In the matter at bar, Mr. Marshall is not only the custodial supervisor at the New York Avenue School, he also had powers tantamount to hiring and firing in that, he alone, determined how many hours substitute custodians worked at his school based upon vacancies, which he admitted were regular. (App. 28-63, 92, 95, 107, 118 and 187-188).  Mr. Marshall was no ordinary supervisor.  As stated in Section B(3) above, Mr. Marshall had full authority to determine which substitute custodians worked at his school on any given day.  He had the power to give substitute custodians regular work, as he did for Moody between September 27, 2012 and January 22, 2013.  (App. 28-51).  And he had the power to take Moody's work hours away as he did for a 9-day period between January 23, 2013 and January 31, 2013.  (App. 9, 53 and 56).  Mr. Marshall was the "defacto" employer in this case— he was defendant's agent.

As stated in Section B(3) above, Moody was told that the only way she could get hours was by trying to get the foremen to give her hours, and that turned out to be true.  Only the foremen schedule substitute custodians who are employed by the defendant.

Although this seems purely academic at this point, Mr. Marshall's had apparent authority to help Moody obtain a full-time custodial contract with defendant.  In the Tenth Circuit Case of Kramer v. Wasatch County Sheriff's Office, 743 F.3d 726 (10th Cir. 2014), the Tenth Circuit ruled that:

> Apparent authority exists where an entity "…has created such an appearance of things that it causes a third party reasonably and prudently to believe that a second party has the power to act on behalf of the first [party]." Bridgeport Firemen's Sick & Death Ben. Ass'n v. Deseret Fed. Sav. & Loan Ass'n, 735 F.2d 383, 388 (10th Cir. 1984). We have recognized that "…the question of apparent authority is usually considered a question of fact." Id.
> One relevant fact question is how much power the principal has actually given to the agent.  Restatement (Third) of Agency § 3.03, cmt. c (2006).  Thus, where the principal (Wasatch County) has given the agent (Sergeant Benson) some amount of power, it might be reasonable for the third party (Ms. Kramer) to believe that the agent has other types of related powers even if the agent actually does not. Id.

Kramer at 741-742.  Mr. Marshall, who had the power to schedule Moody as a substitute, hinted to Moody both verbally and by text message that he could help her get a contract. (App. 3, 34, 100 and 189).  In addition, on December 27, 2012, as part of his last effort to convince Moody to have sex with him, Mr. Marshall

stated "This is the only way you are going to get a contract—if you have sex with me." (App. 3 and 101-102).  Based upon the agency principles of apparent authority, Mr. Marshall was an agent of defendant with respect to his promise of a contract.

In this particular case, Mr. Marshall was Moody's employer. Because Moody was not given set hours as a substitute, her financial welfare fell firmly in the hands of custodial foremen including Mr. Marshall.  Knowing the power he had, Mr. Marshall then conditioned Moody's work hours upon her giving him sexual favors.  Mr. Marshall, as an agent with authority to increase or decrease his subordinate's hours as he wished was defendant's sanctioned agent and defendant is thus vicariously liable for his conduct in the matter at bar.


C. <u>Moody Can Establish a Prima Facie Case of *Quid Pro Quo*</u>
   <u>Sexual Harassment</u>

Before the Supreme Court ruling in <u>Ellerth</u>, the Third Circuit in <u>Bonenberger v. Plymouth Tp.</u>, 132 F.3d 20 (3rd Cir. 1997) restated the holding that "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute [*quid pro quo*] sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment [or] (2) submission to or rejection of such conduct by an

21

individual is used as the basis for employment decisions affecting such individual...." Id at 27 (citing Robinson v. City of Pittsburgh, 120 F.3d 1286, 1296 (3d Cir.1997) (quoting 29 C.F.R. § 1604.11(a)(1) and (a)(2))).

So under this old case law, Moody was subjected to *quid pro quo* sexual harassment, because she was told by her supervisor Mr. Marshall on several occasions that her hours, and possible promotion to a full-time custodian, were conditioned upon giving him sexual favors. Mr. Marshall explicitly set these terms and conditions by verbally telling Ms. Moody on October 26, 2012 that "You can receive more hours if you exchange sexual favors with me." (App. 97). Also, before Christmas break in late December 2012, Mr. Marshall physically grabbed Moody in the office from behind and pulled her backwards towards himself, and when Moody pulled away and asked why he was doing this, Mr. Marshall responded: "You want more hours?" (App. 100-101). On December 27, 2012, Mr. Marshall texted: "Ok ill hit u when I go to work … tonight [at] my other job I am getting all three holes" (App. 3 and 33). After Moody's rejected this sexual advance in a return text, Mr. Marshall then texted "How's penn treating u… U got steady work and that's where the contracts going to b at… I got u" (App. 3, 34, 100 and 189). Mr. Marshall bragged "I got u", meaning he had Moody up against a wall. (App. 3 and 34). Later in the evening of December 27, 2012, Mr.

Marshall showed up at Moody's house uninvited, and when she
opened the door, he walked right in and approached Moody and
told her "This is the only way you are going to get a contract—
if you have sex with me." (App. 3 and 101-102).

Moody has presented more than enough evidence to show that
submission to or rejection of Mr. Marshall's advances were used
as the basis for Mr. Marshall's employment decisions affecting
Moody's hours and possible promotion. Bonenberger at 27. There
was no doubt that Mr. Marshall could decide not to schedule
Moody to work and thus reduce her work hours, and there is also
evidence that Mr. Marshall had considerable influence on Moody's
potential promotion to a full-time (contract) worker. As stated
in Section B(5) above, Mr. Marshall had apparent authority under
agency law to promote Moody.

However, our understanding of *quid pro quo* sexual
harassment was significantly changed a couple of years after the
Bonenberger decision. As stated in Hurley v. Atlantic City
Police Dept., 174 F.3d 95 (3rd Cir. 1999):

> Our understanding of *quid pro quo* sexual harassment
> has been altered by the Supreme Court's decision in …
> Ellerth... In Ellerth, the Court granted certiorari to
> decide whether a plaintiff may state a claim for *quid pro
> quo* sexual harassment "…where the plaintiff employee has
> neither submitted to the sexual advances of the alleged
> harasser nor suffered any tangible effects on the
> compensation, terms, conditions, or privileges of
> employment as a consequence of a refusal to submit to those
> advances?" 118 S.Ct. at 2265. Notwithstanding this
> question, the Court determined that the critical issue in

the case was the scope of employer liability, not the contours of *quid pro quo* sexual harassment. As the Court made clear, **for the purposes of determining employer liability, the categories of *quid pro quo* and hostile work environment are not controlling.** Id. Still, the Court acknowledged that the categories "…are relevant when there is a threshold question whether a plaintiff can prove discrimination" to the extent that "…they illustrate the distinction between cases involving a threat which is carried out and offensive conduct in general." Id. According to the Supreme Court, cases such as Ellerth, which involve only unfilled threats and no tangible employment action, are properly categorized as hostile work environment claims, not *quid pro quo* claims. Id. Accordingly, to prove a claim of *quid pro quo* sexual harassment, a plaintiff must demonstrate either that she submitted to the sexual advances of her alleged harasser or suffered a tangible employment action as a result of her refusal to submit to those sexual advances. See Newton v. Cadwell Labs., 156 F.3d 880, 883 (8th Cir.1998) (discussing *quid pro quo* claims after Ellerth); Ponticelli v. Zurich American Ins. Group, 16 F.Supp.2d 414, 428 (S.D.N.Y.1998) (same).

Hurley at 133.  In Lehmann v. Toys R Us, Inc., 626 A.2d 445

(N.J. 1993), the New Jersey Supreme Court held that "in cases of

supervisory [] harassment, whether the harassment is of the *quid*

*pro quo* or the hostile work environment type, the employer is

directly and strictly liable for all equitable damages and

relief." Lehmann at 617.

In the matter at bar, Moody did submit to Mr. Marshall's

sexual advances on December 27, 2012, but for the two months

prior to that date, she rejected his advances.  Additionally,

after Moody told Mr. Marshall that they would never have sex

again, Mr. Marshall started to reduce her work hours and at one

point stopped scheduling her for nine straight days, causing her

24

to report his conduct to defendant's upper management and human resources on February 4, 2013.  (App. 7, 9, 23, 98, 104-105 and 225-226).  So Moody suffered a tangible employment action—loss of work for nine consecutive days-- as a result of her refusal to submit to Mr. Marshall's sexual advances.

Clearly, the matter at bar could also be considered a *quid pro quo* sexual harassment claim in some respects, but ultimately, it does not matter how we categorize this case based upon the Ellerth decision.

### D. Moody Can Establish a *Prima Facie* Case Retaliation

Moody's Complaint also sets forth claims of retaliation pursuant to both Title VII and the NJLAD, which are subjected to the same analysis by the Courts. Hargrave at 410.  "To establish a *prima facie* case of retaliation under Title VII [or the NJLAD], a plaintiff must prove that (1) she engaged in protected activity, (2) an employer took an adverse action against her, and (3) there was a causal connection between her participation in the protected activity and the adverse action." Pagan v. Holder, 741 F.Supp.2d 687, 698 (D.N.J. 2010)(citing Wilkerson v. New Media Tech. Charter School, Inc., 522 F.3d 315, 320 (3d Cir.2008)).

There is no doubt that Moody engaged in protected activity when she made her complaint to defendant's administration and human resources on February 4, 2013. After her complaint, Moody was separated from Mr. Marshall, but nothing was done to retain her *status quo*. The adverse action claimed by Moody is that her "separation" from Mr. Marshall by defendant merely resulted in her being cast aside to fend for herself to the discretion of the other custodial foremen who possessed the power to give her hours. The animus of the defendant is shown in its own brief. Defendant merely went into damage control after Moody complained and hired outside counsel to conduct an investigation. Defendant took no action to ensure that Moody was getting the same regular hours (and thus the same rate of pay) she was given by Mr. Marshall. "The adverse action must be 'materially adverse' such that it would 'dissuade a reasonable worker from making or supporting a charge of discrimination.'" Id (citing Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)). Given that Moody's work assignments went from an average of 27 hours per week under Mr. Marshall, to 5.77 hours per week when she was separated from Mr. Marshall and put back into the general pool, defendant's so-called action only resulted in increasing her problems by lowering her pay. This result would dissuade any reasonable substitute custodian who was getting regular hours from a

foreman to complain of sexual harassment committed by that
foreman.   (App. 8, 28-51, 55-63, 66-67 and 70-71).

"An adverse employment action is 'some action in response
to her exercise of Title VII rights.' Miller v. D.F. Zee's,
Inc., 31 F.Supp.2d 792, 801-802 (D.Or. 1998)(citing Bouman v.
Block, 940 F.2d 1211, 1229 (9th Cir.), cert. denied, 502 U.S.
1005, 112 S.Ct. 640, 116 L.Ed.2d 658 (1991). Moody need not show
she was fired, demoted, or suffered some financial loss to state
a claim for retaliation. Id.  Evidence of different treatment is
sufficient to support a finding that retaliation caused an
adverse action. Id.  In the Miller case, there is evidence that
plaintiffs' hours were cut, or additional hours were denied,
causing [the plaintiffs] to suffer economic loss. Id.  The court
stated: "An employer's conduct in selectively enforcing
employment policies in retaliation for protected conduct is an
adverse action." Id (citing Cohen v. Fred Meyer, Inc., 686 F.2d
793, 797 (9th Cir. 1982). Miller at 802.

Moody's retaliation claim is based upon her treatment by
the defendant after she complained.  The defendant addressed
Moody's complaint by doing one thing— separating her from Mr.
Marshall.  (App. 106).  This action only resulted in Moody being
back to having no reliable assignment of hours from the other
foremen.  While Moody worked under Mr. Marshall's supervision,
she was being given regular work.  Moody's work assignments

27

after being separated from Mr. Marshall never got close to the
level they were in September 2012 through December 2012.  (App.
108). Under Mr. Marshall's supervision, Moody was assigned work
regularly on a weekly basis at the New York Avenue School (App.
8, 28, 96, 98-99, and 187).  Her payroll records show that after
Hurricane Sandy on October 29, 2012 and through January 4, 2013,
she was working an average of more than 27 hours per week (which
is about 3.38 full work days per week).  (App. 8, 28-51 and 70-
71).  However, after she reported the sexual harassment on
February 4, 2013, during the remainder the school year and after
(a period of 20+ weeks), Moody only worked a total of 115.5
hours, which amounted to an average of under 5.77 hours per
week, which was nearly 15 hours less per week than before Moody
complained of sexual harassment (App. 8, 55-63 and 66-67).
Moody was assigned 0 hours for each of the two week pay periods
ending March 6, 2013, March 20, 2013, April 12, 2013, June 7,
2013, June 21, 2013 and July 5, 2013 (App. 66-67 and 69-70),
while she had no pay periods in which she worked 0 hours while
working under Mr. Marshall. (App. 8, 28-56 and 70-71).  Moody
tried to solicit more work from the other custodial foremen in
May 2013, but it did not help. (App. 107-108 and 115).   Moody
was assigned no more than about two times weekly through the end
of that year, and by the following school year 2013/2014,
Moody's assignments were reduced back down to the 2009 through

September 2012 level-- "once in a blue moon." (App. 107-108, 65-68 and 69). Moody's final assignment was in about May 2014. (App. 68, 69 and 108).

Moody also has some evidence of defendant's intent to retaliate. For example, Mr. Marshall texted Moody that he did not like "trouble makers" and he "gets rid of all his problems." (App. 6-7, 17 and 23). Ms. Yahn testified that Moody complained that "she should be getting more hours", and she responded by explaining to her "…that she was a substitute, an at-will employee." (App. at 226-227). This indicated that Yahn intended to take no action to preserve the *status quo* regarding Moody's assigned hours. Moody testified that she believed that the lack of assignments at the New York Avenue School was punishment for her speaking out. (App. at 106). She also testified that there were vacancies at other schools that she could have been placed at, including the Pennsylvania Avenue School, where her co-worker, Amanda Coley got daily work as a substitute. (App. at 106). Although Moody requested that Lamont Elliot, foreman at the Pennsylvania Avenue School, give her assignments, those assignments abruptly stopped after her complaint with administration in February 2013. (App. at 106-107 and 55-63).

The evidence as presented by defendant in its Motion indicates that defendant tried harder to deny that the sexual

29

harassment occurred, than to help Moody maintain her *status quo* regarding wages.  Defendant was not concerned with Moody's sharp drop in pay— instead defendant hired expensive lawyers to perform a one-sided investigation to conclude that Moody's claims of sexual harassment were unfounded.  Mr. Marshall had been accused by at least three other individuals of severe behavioral issues including: (1) In March 2008, Mr. Marshall was accused by his school Principal of physically hitting and injuring another custodian while on the job (App. 159, 161, 173 and 182); (2) In July 2010, Mr. Marshall was accused by his school Principal of among other things, displaying nonchalant and disrespectful behavior to the school principal at custodial meetings (App. 161, 169, 171-172 and 182-183); and (3) In 2013, Daniel Smith, a custodian at the New York Avenue School, complained that Mr. Marshall called him a "stupid retarded mother fucker."

Despite these other claims of behavioral issues at the workplace, Mr. Marshall was treated like he could do no wrong. (App. 161-163, 183-184 and 210).  In December 2010, only five months after his second set of disciplinary charges from his Principal, the defendant promoted Mr. Marshall from custodian to custodial foreman.  (App. 159-162, 169, 171-173 and 184).  And despite the serious complaints made by Moody and Daniel Smith in 2013, Mr. Marshall remained gainfully employed as a custodial

foreman.   (App. 162-163 and 210).   In the interim, Moody never regained her regular hours she worked under Mr. Marshall and, instead of being helped in her time of need by defendant, she was left to fail.

IV.   Conclusion

WHEREFORE, plaintiff, Michelle Moody, respectfully requests that defendant's Motion for Summary Judgment be denied.

/s/ Samuel A. Dion

Samuel A Dion, Esquire
Dion & Goldberger
1845 Walnut Street
Suite 1199
Philadelphia, PA 19103
215-546-6033
samueldion@aol.com
Counsel for Plaintiff