UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| MICHELE MOODY, | : | Hon. Joseph H. Rodriguez: |
| Plaintiff, | : | Civil Action No. 14-4912 |
| v. | : | OPINION |
| ATLANTIC CITY BOARD OF EDUC., | : | |
| Defendant. | : | |

This matter is before the Court on Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. [Doc. 22.] The Court has reviewed the submissions and decides the matter based on the briefs pursuant to Fed. R. Civ. P. 78(b). For the reasons stated here, the motion will be granted.

## **Jurisdiction**

This case is a civil action over which the district court has original jurisdiction based on a question "arising under the Constitution, laws, or treaties of the United States." See 28 U.S.C. § 1331. Plaintiff asserts that she was sexually harassed and retaliated against in violation of Title VII, 42 U.S.C. § 200o(e) of the Civil Rights Act of 1964 as amended. With respect to Plaintiff's state law claims, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

1

## Background

Plaintiff Michele Moody claims that she was sexually harassed while employed as a Substitute Custodian for Defendant Atlantic City Board of Education. Atlantic City School District is comprised of eleven schools. As a Substitute Custodian, Plaintiff was part of a pool of employees that potentially could be called to work in any one of the schools should the need arise. She was paid on a per diem basis and was not guaranteed work. (Moody Dep. p. 24-25.)

Plaintiff's alleged harasser, Maurice Marshall, is a full-time Custodial Foreman at the New York Avenue School, one of the schools in the District. He has no authority to hire staff or award contracts on behalf of the District; he has no involvement as to the hiring of full-time custodians. (Marshall Dep. p. 24-25.) However, it appears that he was responsible for scheduling substitute custodians to work at the New York Avenue School. (Moody Dep. p. 40, 130.)

Beginning on October 26, 2012, Plaintiff received calls to work at the New York Avenue School, and did work there. At that time, Plaintiff alleges that Marshall informed her that she would receive more hours at his school in exchange for sexual favors. (Moody Dep. p. 44-45.) Shortly after October 26, 2012, Marshall allegedly grabbed Plaintiff by the arm in the stairwell

and tried to pull her close to him to kiss him, but Plaintiff pulled away. (Moody Dep. p. 47.) In early to mid-November 2012, Plaintiff was called over the radio to come to Marshall's office, and when she opened the door, Marshall allegedly was sitting unclothed in his office chair. (Moody Dep. p. 52.) Plaintiff walked out, (id.), causing Marshall to ask Plaintiff: "Where are you going?" (Moody Dep. p. 53.) Plaintiff kept walking. (Id.) Nonetheless, she continued to get the same level of custodian work – allegedly 4 to 5 days per week. (Moody Dep. p. 55.) Plaintiff also alleges near daily sexual advances and/or text messages from Marshall, which she was uncomfortable with and rejected.[1] This conduct allegedly culminated in a December 2012 encounter between the two at Plaintiff's home during which Marshall informed Plaintiff that the only way she would get a

---

[1] For example, Marshall would comment on how tight Plaintiff's jeans were and that girls from Plaintiff's section of town are "dirty girls." (Moody Dep. p. 125.) Also among the daily comments that Marshall made to Plaintiff included: "If your dad knew you were dressed like that he would be shakin' his head" and "Why does your butt shake like that?" and he would tell other female employees: "Don't you wish your but was big that that." (Moody Decl. ¶ 46.) Also, on a weekly basis, Marshall would often grab Plaintiff's breasts or buttocks at the work place. (Moody Decl. ¶ 47.) On about November 5, 2012, Marshall called Plaintiff into his office and tried to take her shirt off. (Moody Decl. ¶ 45.) Just before Christmas break in late December 2012, Marshall again physically grabbed Plaintiff in the office from behind and pulled here backwards towards himself. (Moody Dep. p. 60.) Plaintiff pulled away and asked why he was doing this. Marshall responded: "You want more hours?" (Moody Dep. p. 61.)

3

contract with Defendant would be to engage in sexual activity with him.[2] (Moody Dep. p. 64.) The two allegedly engaged in sexual relations in Plaintiff's house. (Moody Dep. p. 66.) Marshall denies having made sexual comments or advances, as well as having entered Plaintiff's house and sexual relations. (Marshall Dep. p. 33-35, 42, 51-52.)

Plaintiff asserts that she informed Marshall shortly afterward that what they had done would never happen again, (Moody Dep. p. 126); she states that her work hours were then substantially reduced. (Moody Decl. ¶ 18-19.)[3] On January 23, 2013, when Plaintiff attempted to pick up her paycheck at the New York Avenue School, Marshall was playing ping pong and made Plaintiff wait for her check. (Moody Decl. ¶ 20.) At that time, Plaintiff noticed that a new substitute custodian, Michelle McArthur, was

---

[2] On December 27, 2012, Marshall started texting Plaintiff at 6:05 p.m.:
  Marshall: "U playing . . . Well . . . Ok ill hit u when U go to work."
  Plaintiff: "In the am?"
  Marshall: "No tonight my other job I am getting all three holes."
  Plaintiff: "No the hell u not."
  Marshall: "How's penn [another school] treating u . . . U got steady work and that's where the contracts going to b at . . . I got u"
(Moody Decl. Ex. 1.)
Later that evening, Marshall allegedly went to Plaintiff's house uninvited, and told her "This is the only way you are going to get a contract." (Moody Decl. ¶ 16.)
[3] During her deposition, Plaintiff theorized that her hours had been reduced because her coworkers had inquired about whether there was an inappropriate relationship between her and Marshall that caused her to receive special treatment. (Moody Dep. p. 68-69.)

working at the New York Avenue School. (Moody Decl. ¶ 21.) Plaintiff alleges that she was informed by another custodian at the school, Eloise Spellman, that Plaintiff was on Marshall's "shit list." (Moody Decl. ¶ 22; Moody Dep. p. 72.)[4]

After Plaintiff left the New York Avenue School that morning, she initiated a text exchange with Marshall.

> Plaintiff: "U don't gotta act like that towards me, I understand your [sic] upset at me but, outside of that Im a good worker but, Its cool."
> Marshall: "Wt are u talking about, I'm not into the drama."
> Plaintiff: "Just making sure Im not on ya so call "shit list"."
> Marshall: "U are but not like that I won't stop u from getting I don't play games like that."

(Moody Decl. ¶ 23-27; Ex. 1.) The remainder of that week, Plaintiff was not assigned any work by Marshall but the new substitute custodian, McArthur, was assigned three days that week. (Moody Decl. ¶ 29.) On January 29, 2013, Plaintiff again initiated a text exchange with Marshall.

> Plaintiff: "Guess it is messing with my hours, Its cool though."

---

[4] In her deposition, Spellman testified that she never saw Marshall be disrespectful to any employees. (Spellman Dep. p. 7-8.) She testified that she never texted or told anyone that Plaintiff was on Marshall's "shit list," and she did not have any conversations with Plaintiff about Marshall or with Marshall about Plaintiff. (Spellman Dep. p. 8.) Spellman further testified that there was one instance she remembered when Plaintiff was not working on a particular day and Plaintiff said "He's [meaning Marshall] not letting me work today, he's letting Michelle [McArthur] work. He said he's letting Michelle work. Oh, I got something for that ass." (Spellman Dep. p. 10-11.)

> Marshall: "Wt are you talking about please stop . . . I see your a trouble starter don't know wts your problem but I got rid of all my trouble at this school if you have a problem with me my door is always open."
> Plaintiff: "Im not a trouble starter or a problem U said that I was on your "shit list" to Ms. Weezy but I knew what u were referring to because it got out that we were messing around, I knew I should have never engaged into that with u but, It is what it is that should have never interfered with me lossing hours cause Im a good worker but, Its cool if only I knew what I know now but, everybody tried to warn me."
> Marshall: "One when the fuck we mess around two u get mad cause I wouldn't stop playing my game and go get your check like who are u I said give me a min, so I didn't do anything to u u did it to your self, and the ppl telling u to watch me lol all the subs work for me are cool and come back, take a look at your self before u blame anyone we was cool till u started bugging . . . Like I said I don't argue with subs to many ppl want jobs and on the list."
> Plaintiff: "Yo I have all the text messages and my parents saw u when u came to my house."
> Marshal: "Lol moody something really wrong with u than u say y we got beef it's not me who has the beef it's u on that note."
> Plaintiff: "I don't have beef Im just seeing now what everybody was talking about . . . How u really are."
> Marshall: "How am I u was coming in u was being called u was getting hours wt are I talking about how did I disrespect U but you did me telling ppl we had sex cause I didn't get your ck fast enough, like I said u have beef come talk to me that's wt woman do this some teen shit."
> Plaintiff: "Monk whatever . . . Look I never disrespected u any type of way my thing is as long as we were messing around and nobody knew I got hours then when word got out u stopped calling me in for work its cool though but, I work to feed and cloth my children and with that being said I have to do whats best for me . . ."
> Marshall: "Look I haven't called u in one week that's it shell came in for wizzy while she was there mark took off that's why she got them days u are bugging for real not even that serious. Are u going through something personal cause this is crazy."

(Moody Decl. ¶ 30-41; Ex. 1.)

6

On February 4, 2013, Plaintiff made a complaint against Marshall to Assistant Superintendent Sherry Yahn, who immediately took Plaintiff to Human Resources to lodge a written complaint. (Moody Decl. ¶ 43; Moody Dep. p. 76-77; Yahn Dep. p. 9-11.)  That day, Diane Saunders, Supervisor of Human Resources had a telephone conversation with Plaintiff concerning her complaint and setting up an in-person meeting with the New York Avenue School Principal, James Knox. (Moody Dep. p. 77-78.) On February 12, 2013, Plaintiff was sent correspondence confirming the meeting. (Moody Dep. p. 78.)

On February 12, 2013, Diane Saunders held a meeting with Maurice Marshall, James Knox, Principal of the New York Avenue School, Kurt Austin, District Facilities Manager, Edzii Ebenezer, President of the Head Custodian Association, and Brian Currie, NJEA Representative. (Riley Cert., Ex. I.) Marshall adamantly denied all of Plaintiff's allegations. (Id.) He stated that Plaintiff began to make allegations against him when he began to call another substitute custodian in for work. Marshall further provided that he did stop calling Plaintiff into work because of the accusations she was making about him. (Id.)

On February 13, 2013, eight custodians from the New York Avenue School were individually interviewed with regard to Plaintiff's allegations.

7

(Riley Cert., Ex. I.) The eight custodians were Mark Crumble, Hattie Martin, Eloise Spellman, Harold Barnes (substitute), Granville Haywood, Daniel Smith, Michael Downing, and Joseph Beaman III. (Id.) All of the custodians were asked if they witnessed any inappropriate behavior by Marshall towards Plaintiff. All of the custodians answered in the negative. (Id.)

During a February 14, 2013 meeting, Saunders and Knox questioned Plaintiff about the circumstances that lead to her complaint. (Moody Dep. p. 78.) While the investigation into Plaintiff's allegations was pending, she was informed that she would be separated from Marshall. (Moody Dep. p. 81.) Thereafter, she did not receive any assignments at the New York Avenue School. (Moody Dep p. 82; Marshall Dep. p. 53.)

Defendant Atlantic City Board of Education retained an outside law firm to investigate the claim of harassment made by Plaintiff. (Riley Cert., Ex. M.) The law firm of DeCotiis, Fitzpatrick & Cole, LLP conducted an investigation, and rendered a report in this matter. Witnesses were again interviewed, including Plaintiff. (Riley Cert., Ex. M & N.) The DeCotiis investigation recommended a finding of no sexual harassment or discrimination. (Riley Cert., Ex. N.) Human Resources was unable to come to any finding of sexual or other discrimination in the workplace. (Riley

Cert., Ex. O.) Plaintiff was notified of the findings and the reasons for the findings in correspondence dated July 23, 2013. (Riley Cert., Ex. O.)

In October of 2013, Plaintiff's children were transferred from the New York Avenue School to the Uptown School Complex; Plaintiff views the transfer as retaliation for complaining about Marshall. (Moody Dep. p. 92.) Plaintiff's children previously attended the Martin Luther King Complex due to ongoing custody issues, but Plaintiff became angry with the school's principal, and requested that her children be able to attend the New York Avenue School because that school was closer to where her parents lived. (Yahn Dep. p. 17-19.) Yahn granted the request and Plaintiff's children were enrolled at New York Avenue. (Yahn Dep. p. 19; Yahn Cert.¶ 3-6.) Plaintiff's son was placed in a program outside the district for behavioral issues, and when he was to re-enroll through the district's central registration, it was determined that his neighborhood school was at Uptown Complex, so that is where he was placed. (Yahn Dep. p. 21-22 Yahn Cert.¶ 7.) Further, Yahn explained to Plaintiff that having her three children in the same neighborhood school would help with the truancy issues she had. (Yahn Dep. p. 31 Yahn Cert.¶ 9-10.)

## **Summary Judgment Standard**

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." <u>Pearson v. Component Tech. Corp.</u>, 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)); <u>accord</u> Fed. R. Civ. P. 56 (a).  Thus, the Court will enter summary judgment in favor of a movant who shows that it is entitled to judgment as a matter of law, and supports the showing that there is no genuine dispute as to any material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56 (c)(1)(A).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. <u>Id.</u>  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the

nonmoving party.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  <u>Id.</u>; <u>Maidenbaum v. Bally's Park Place, Inc.</u>, 870 F. Supp. 1254, 1258 (D.N.J. 1994).  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  <u>Andersen</u>, 477 U.S. at 256-57.  "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" <u>Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs</u>, 982 F.2d 884, 890 (3d Cir. 1992) (quoting <u>Quiroga v. Hasbro, Inc.</u>, 934 F.2d 497, 500 (3d Cir. 1991)).  Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

<u>Celotex</u>, 477 U.S. at 322.  That is, the movant can support the assertion that a fact cannot be genuinely disputed by showing that "an adverse party

11

cannot produce admissible evidence to support the [alleged dispute of] fact."  Fed. R. Civ. P. 56(c)(1)(B); accord Fed. R. Civ. P. 56(c)(2).

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  Credibility determinations are the province of the factfinder.  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## Discussion

Title VII of the Civil Rights Act of 1964 makes it unlawful for employers to "discriminate against any individual with respect to compensation, terms, conditions or privileges of employment, because of such individual's . . . sex." 42 U.S.C § 2000e–2(a)(1). Because New Jersey courts "have frequently looked to case law under Title VII . . . for guidance in developing standards to govern the resolution of LAD claims," the Court will analyze the NJLAD claims together with the Title VII claims. Carmona v. Resorts Int'l Hotel, Inc., 915 A.2d 518 (N.J. 2007).

Sexual harassment that is actionable under Title VII can take two forms—quid pro quo or a hostile work environment. "Quid pro quo" harassment involves express or implied demands for sexual favors by a

superior directed at a subordinate in exchange for a benefit or the avoidance of a negative consequence. Meritor Sav. Bank v. Vinson, 477 U.S. 57, 66 (1986). This type of harassment consists of "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment [or] (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual." Robinson v. City of Pittsburgh, 120 F.3d 1286, 1296 (3d Cir. 1997) (abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006)). "[A] plaintiff may prove a claim of quid pro quo sexual harassment by showing that 'his or her response to unwelcome advances was subsequently used as a basis for a decision about compensation, [terms, conditions, or privileges of employment].'" Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281-82 (3d Cir. 2000) (quoting Robinson, 120 F.3d at 1297).

To establish a prima facie case of hostile work environment, a plaintiff must show that "(1) the employee suffered intentional discrimination because of their sex; (2) the discrimination was [severe or pervasive]; (3) the discrimination detrimentally affected the plaintiff; (4)

the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability." Huston v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 104 (3d Cir. 2009) (internal citations and quotation marks omitted).[5] Accord Jensen v. Potter, 435 F.3d 444, 449 n.3 (3d Cir. 2006).

In analyzing a hostile work environment case, the courts must "determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998) (internal citations and quotation marks omitted). See also Burlington Indus. v. Ellerth, 524 U.S. 742, 752 (1998) (A plaintiff bringing a hostile work environment claim under Title VII must allege harassment that is severe or pervasive.). That is, Title VII is violated only "[w]hen the workplace is permeated with discriminatory intimidation,

---

[5] In applying the NJLAD, the New Jersey Supreme Court uses a similar test, requiring that "the complained-of conduct (1) would not have occurred but for the employee's gender; and it was (2) severe or pervasive enough to make a (3) reasonable [person of that gender] believe that (4) the conditions of employment are altered and the working environment is hostile or abusive." Lehmann v. Toys 'R' Us, 626 A.2d 445, 453 (N.J. 1993).

14

ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor, 477 U.S. at 65, 67). "Title VII is not intended as a 'general civility code.'" Burgess v. Dollar Tree Stores, Inc., 642 F. App'x 152, 154–55 (3d Cir. 2016) (quoting Faragher, 524 U.S. at 788).

When a co-worker harasses a plaintiff, an employer is liable for its employee's unlawful harassment if the employer was negligent with respect to the offensive behavior. Vance v. Ball State Univ., --- U.S. ---, 133 S. Ct. 2434, 2441 (2013). Under the Ellerth/Faragher analysis, the employer in a hostile work environment sexual harassment case may assert as an affirmative defense to vicarious liability that it 'exercised reasonable care to prevent and correct promptly any sexually harassing behavior,' and 'the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise,' provided that the employer has not taken an adverse tangible employment action against the plaintiff employee." Aguas v. State, 107 A.3d 1250, 1253 (N.J. 2015) (quoting Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 807-08).

The New Jersey Supreme Court has held that "an allegedly harassing employee is the complainant's supervisor if that employee had the authority to take or recommend tangible employment actions affecting the complaining employee, or to direct the complainant's day-to-day activities in the workplace. <u>Id.</u> Similarly, the United States Supreme Court has held that "an employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, i.e., to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" <u>Vance</u>, 133 S. Ct. at 2443 (quoting <u>Ellerth</u>, 524 U.S. at 761). "The ability to direct another employee's tasks is simply not sufficient." <u>Vance</u>, 133 S. Ct. at 2448.

In order to make out a prima facie case of retaliation, the plaintiff must show: (1) that she engaged in a protected activity, which can include informal protests of discriminatory employment practices such as making complaints to management; (2) adverse action taken by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the protected activity and the adverse action. <u>Daniels v. Sch. Dist. of Phila.</u>, 776 F.3d 181, 193 (3d Cir. 2015). Again,

16

[w]hile this discussion focuses on Title VII, the same analysis applies to [Plaintiff's] NJLAD claim. . . . To establish a prima facie case of retaliation under the NJLAD, [a Plaintiff] must [show] both that she opposed 'a practice rendered unlawful' by the statute and that the employer knew about that opposition." Davis v. City of Newark, 417 F. App'x 201, 203 (3d Cir. 2011) (quoting Young v. Hobart W. Group, 897 A.2d 1063, 1073 (N. J. Super Ct. App. Div. 2005)).

In this case, Plaintiff has not established that Marshall was her supervisor. Although Marshall was able to call Plaintiff into work at the New York Avenue School when needed, so were ten other maintenance forepersons, as well as the Board office. Marshall did not have authority to terminate Plaintiff or make any other personnel decisions.

Assuming arguendo that Marshall was Plaintiff's supervisor, the record does not support a finding that Plaintiff's response to Marshall's alleged unwelcome advances was subsequently used as a basis for a tangible employment action, that is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Vance, 133 S. Ct. at 2442 (quoting Ellerth, 524 U.S. at 761).

During each of the two pay periods ending October 26, 2012, Plaintiff worked and was compensated for 24 and 40 hours. (Riley Cert. Ex. L.) She then began to receive calls from Marshall to work at the New York Avenue School. Plaintiff worked 19.5, 64, 46, and 48 hours per pay period during which time she alleges that she consistently rejected Marshall's advances. During the week of and the week after their alleged sexual encounter, December 23, 2012 through January 4, 2014, Plaintiff worked exclusively at the Pennsylvania Avenue School and logged 72 hours. Plaintiff asserts that shortly thereafter, she informed Marshall that they would not have further sexual relations, yet she was scheduled for 38.5 and 24 hours at the New York Avenue School during the subsequent two pay periods. Plaintiff filed her complaint with Human Relations on February 4, 2013 but, during that week and the next, she worked 36 hours at Pennsylvania Avenue.

Upon initiating an investigation into Plaintiff's accusations against Marshall, Defendant instructed the two to have no contact with each other. As such, one would not expect Marshall to call Plaintiff in to substitute at New York Avenue. Plaintiff continued to be called to work at other schools

in the District sporadically until May of 2014, during which she worked 48 hours in one pay period. (Id.)[6]

As Plaintiff has failed to establish a tangible employment action taken against her by Defendant, Defendant is able to avoid liability if it can establish an affirmative defense by showing that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior and the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. See Ellerth, 542 U.S. at 765; Faragher, 524 U.S. at 807. There is nothing in the record to support a finding the Defendant knew or should have known of the alleged harassment and failed to take prompt remedial action. Indeed, the opposite has been shown through record evidence, as outlined above. Upon being notified of Plaintiff's allegations, Defendant conducted a thorough investigation. Plaintiff and Marshall were

---

[6] During the pay period ending April 12, 2013, Plaintiff worked and was compensated for 23 hours. During the pay period ending April 26, 2013, Plaintiff worked and was compensated for 8.5 hours. During the pay period ending May 10, 2013, Plaintiff worked and was compensated for 40 hours. During the pay period ending May 24, 20913, Plaintiff worked and was compensated for 8 hours. Plaintiff was not called in for hours during the months of June, July, August, or September 2013. Plaintiff was also not called into work during the summer months of June, July, August, or September of 2012.

directed to have no contact with each other, and that directive was confirmed in writing by certified mail.

Regarding Plaintiff's claim of retaliation, the Court finds no causal connection between Plaintiff complaining about Marshall and the assignment of her children to their neighborhood school. Additionally, as stated, Plaintiff continued to be called into work on a substitute basis after lodging her complaint.

## **Conclusion**

For the reasons stated above, Defendant's motion for summary judgment will be granted. An Order will accompany this Opinion.


Dated: December 13, 2016              /s/ Joseph H. Rodriguez
                                                        Joseph H. Rodriguez, USDJ